IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ERIC WILMER GIBSON,
     Plaintiff,

vs.                        Case No.:  3:14cv641/MCR/EMT

ERIC HOLDER, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff, a non-prisoner proceeding pro se and in forma pauperis, commenced this action by filing a civil complaint (doc. 1).  Pending before the court is Plaintiff's Fifth Amended Complaint, in which he asserts claims under 5 U.S.C. § 8120, 5 U.S.C. § 552a, 28 U.S.C. § 535, 28 U.S.C. § 2462, Proposition 215 of the California Health and Safety Code 11362.5, 42 U.S.C. §§ 1981, 1983, and 1985, and Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) (doc. 29).[1]

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  See N. D. Fla. Loc. R. 72.2(E); see also 28 U.S.C. § 636(b)(1)(B)(C); Fed. R. Civ. P. 72(b).   After careful consideration of all issues raised by Plaintiff, it is the opinion of the undersigned that dismissal of this action is warranted.

---

[1] Bivens recognizes a private right of action for money damages against federal actors that engaged in alleged violations of the Constitution or laws of the United States.  Bivens, 403 U.S. at 397.

I.      PLAINTIFF'S ALLEGATIONS[2]

Plaintiff was employed by the Federal Bureau of Investigation ("FBI") from September 23, 1990 to January 4, 2001 (*see* doc. 29 at 6; *see also* doc. 1 at 13).[3]  On May 19, 1997, Defendant Zachary Lowe, an FBI Assistant Special Agent in Charge ("ASAC"), sent a cover letter to the Office Workers' Compensation Program ("OWCP") of the Department of Labor, enclosing a Federal Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation form, which Plaintiff's alleges was "altered" by Defendant Floyd Wiltz, an FBI Special Agent (doc. 29 at 6).  Three months prior, on February 20, 1997, Plaintiff's direct supervisor, James Bernazzani, prepared the original form and sent it to FBI headquarters (*id.*).

On May 22, 1998, Defendant Clarence Venables, an FBI ASAC, and another FBI agent came to Plaintiff's residence, seized his personal weapons, and ordered him to report to the FBI office, where they interrogated and drug-tested him as part of an investigation by the FBI's Office of Professional Responsibility ("OPR")[4] (doc. 29 at 7).[5]

---

[2] Plaintiff's factual allegations are presented in chronological order.  The undersigned presents factual assertions from Plaintiff's initial complaint (doc. 1) when those assertions clarify the allegations of his Fifth Amended Complaint, which is the operative pleading.

[3] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those Plaintiff may have assigned.

[4] The FBI's OPR administers the disciplinary system within the FBI to enforce the rules of conduct for FBI employees (*see* doc. 1 at 40).

[5] Plaintiff provided more details about the OPR investigation in his initial complaint (doc. 1).  He alleged that in June of 1993, while he was employed with the FBI, the Houston Police Department came to his home to investigate an "incident" which occurred between him and his daughter (doc. 1 at 24).  Plaintiff alleged that his daughter, Ranita Fortenberry, filed a "complaint" with the State of Texas child protective services agency ("CPS") (*see id.* at 42). Plaintiff alleged the police prepared a report and referred it to CPS.  He alleged that the next day, he provided a sworn statement to a CPS investigator.  Plaintiff alleges in the instant complaint that the matter was referred to a grand jury and the case was "no billed" (*see* doc. 29 at 8).  Plaintiff reported this matter to the OPR, and the matter was investigated (*see* doc. 29 at 9, *see also* doc. 1 at 24–25).  Plaintiff alleges Defendant Michael Wilson, a Special Agent in Charge, falsely reported that the Houston District Attorney declined presentation of the case to the grand jury, when in fact the grand jury heard the evidence and returned a "no bill" (doc. 29 at 9).  Plaintiff alleged in his original complaint that he was interviewed by two FBI agents in February of 1994, as part of the OPR investigation (doc. 1 at 24).  He alleged they requested that he take a polygraph test, but he refused (*id.*).  He alleged that in June of 1994, the FBI took personnel action against him, including a letter of censure and disciplinary probation, for failing to report off-duty contact with a police officer (*id.* at 25).

Plaintiff alleged that a second OPR investigation occurred in 1997.  He alleged that on May 29, 1997, he was

On October 2, 1998, Plaintiff was ordered to appear at FBI headquarters to be interviewed by Defendant Michael Ward, an investigator with the OPR (*id.* at 9).   Defendant Ward made "unconfirmed changes" to Plaintiff's "statement," "added items" without Plaintiff's knowledge, and

---

interviewed by two FBI Supervisory Special Agents concerning allegations of possible misconduct in an official vehicle in the vicinity of a public school (doc. 1 at 22).  Plaintiff alleged the agents asked him what he recalled from his contact with local police officials in April of 1996.  Plaintiff alleged he explained that a police officer stopped his vehicle and advised that his vehicle had been reported as suspicious by the security staff of a public school.  Plaintiff alleged the school security staff had issued an alert to determine who owned the vehicle and whether the vehicle was doing anything illegal.  Plaintiff alleged he advised the police officer that he was returning from an official investigation only a short distance away.  Plaintiff alleged the FBI agents asked him whether he had ever stalked any school children or talked with any school children.  Plaintiff alleged he signed a written statement reflecting the substance of the interview.

The OPR investigation conducted by Defendant Venables on May 22, 1998, related to an incident which occurred on May 21, 1998, when Plaintiff was stopped by sheriff's deputies (doc. 1 at 26–27).  Plaintiff alleged he was stopped after the deputies were "flagged down" by a female and her daughter, who believed that Plaintiff was following them.  Plaintiff told the deputies that he was en route from the grocery store to his residence and took a detour four blocks away to determine if one of his associates was home.  Plaintiff told the deputies that when he observed that his associate's car was not at home, he attempted to return home and was stopped by a passing train.  Plaintiff explained that the route he had taken from the grocery store was "unavoidable" and "coincidentally" the same route taken by the female and her daughter.  Plaintiff alleged the deputies asked him to explain how he came to speak to a young lady who was shopping at the store, and he "explained the events fully."

In his initial complaint, Plaintiff also alleged that during the interrogation by Defendant Venables, he was notified that the OPR was also investigating an allegation that Plaintiff was currently using marijuana (doc. 1 at 27).  Plaintiff alleged he submitted to a drug test.  He alleged that after the test, Venables and another FBI agent questioned him about current and past marijuana use, and whether he had ever received drug treatment.  Plaintiff alleged that months later, on January 4, 1999, two different FBI agents ordered him to submit to a second drug test (doc. 1 at 38–39).

"substituted forms with earlier drafts" (*id.*).[6]  Plaintiff did not have legal representation during the "illegal interrogation" (*id.*).[7]

On February 17, 1999, Plaintiff was directed to report to FBI Headquarters that same day (doc. 29 at 7).[8]  The next day, February 18, 1999, Defendant James Ohlson, an FBI Security

_____

[6] In Plaintiff's initial complaint, he alleged that on October 21, 1998, he traveled to Washington DC to be interviewed by Ward regarding an investigation by the OPR (doc. 1 at 36).  Plaintiff alleged that Ward began the interview by questioning him about the allegations underlying the closed 1993 OPR investigation (which resulted in Plaintiff's being disciplined for failing to report his off-duty contact with the Houston Police Department in June of 1993, when police investigated an "incident" which occurred between Plaintiff and his daughter).  Plaintiff alleged that he informed Ward that he had already provided two written statements during the 1993 investigation, and he did not intend to give a third statement regarding a closed investigation.  Ward advised Plaintiff that if he did not answer his questions, Ward would consider Plaintiff's actions as a failure to cooperate with the investigation.  Plaintiff alleged that he then briefly summarized the events underlying the 1993 OPR investigation.  He alleged that Ward then began questioning him about the closed 1996 OPR investigation (involving Plaintiff's contact with local police in April of 1996, when he was questioned about the presence of his vehicle near a public school).  Plaintiff alleged that Ward advised him that three different groups of students at the public school had identified his vehicle and reported that his vehicle drove by the school very slowly and suspiciously.  Plaintiff alleged that Ward then began questioning him about two open OPR investigations, involving allegations that he used marijuana during his FBI employment and had received drug treatment, and Plaintiff's contact with sheriff's deputies on May 21, 1998, regarding his allegedly harassing the female and her daughter at the grocery store and then following them home.  Plaintiff alleged that Ward then questioned him about information that OPR had received concerning Plaintiff's contact with a neighbor, Ms. Mortenson, specifically, whether Mortenson was a teenager, and whether Plaintiff had ever tried to kiss her.  Plaintiff alleged he told Ward that Ms. Mortenson was 19 years old.

Plaintiff alleged that on October 23, 1998, the day after his interview with Defendant Ward, he returned to FBI headquarters to review his written statement, which Ward had prepared (doc. 1 at 37–38).  Plaintiff alleged he made corrections to the statement, and Ward prepared a second draft.  Plaintiff alleged he reviewed the second draft and found information that was not included in the original draft, and when he asked Ward about it, Ward advised that "there were a few other items that he had in include," including further details concerning Plaintiff's alleged contacts with Ms. Mortenson.  Plaintiff alleged, "the responses included by Ward would have been my responses if I were asked those additional questions during the interview" (*id.*).  Plaintiff alleged that he then briefly reviewed and signed the "final statement," even though he did not read the entire statement (*id.* at 37–38).  Plaintiff also alleged that Ward asked him to submit to a polygraph examination (*see id.* at 41), but he refused because he did not believe that FBI policy required him to submit to a polygraph.  Plaintiff alleged he asked Ward "what would happen next" concerning the two open OPR investigations.  Ward responded that the investigation would be forwarded to the Security Adjudication Unit.  Ward stated that because Plaintiff continued to refuse to submit to a polygraph examination after being ordered to do so, the Security Adjudication Unit would not be able to ascertain Plaintiff's truthfulness, and would therefore revoke Plaintiff's security clearance and terminate him from employment with the FBI.

[7] Plaintiff states he had retained Guy L. Womack, a private attorney, to attend the interview with him, but Attorney Womack terminated his representation after unidentified FBI employees disclosed information about OPR investigations involving Plaintiff (*see* doc. 29 at 9).

[8] In Plaintiff's initial complaint, he alleged that on February 1, 1999, he met with Assistant Special Agent in Charge Hansen and Chief Division Counsel Haman (doc. 1 at 40).  Plaintiff alleged they told him they had received a communication from the Personnel Security Unit in Washington, D.C., advising that Plaintiff would be interviewed in Washington D.C. on February 8, concerning his security clearance.  Plaintiff alleged he spoke with a representative of

Programs Manager, notified Plaintiff that his security clearance was immediately suspended for his failure to report to FBI Headquarters for an interview and refusal to complete the security investigation process (*see* doc. 29 at 7; *see also* doc. 1 at 42, 44).[9]  Plaintiff was suspended from employment without pay on April 16, 1999 (*see* doc. 29 at 7; *see also* doc. 1 at 44–45).  On May 10, 1999, Defendant Ohlson notified Plaintiff that if he wished to request reconsideration of the denial of his security clearance, he must do so within 30 days (*see* doc. 1 at 46).  Attached to Ohlson's notice were 51 pages of documents from Plaintiff's security investigation file, which were prepared by FBI officials, supervisors, and investigators (Plaintiff refers to these documents as his "releasable records") (*id.*).  According to Plaintiff, the documents contained lies, distortions of fact, rumors, hearsay statements, and "a host of other irregularities" (*id.*).  One of the documents was an interview with an employee of the Texas child protective services agency regarding the 1993 incident involving Plaintiff's daughter (*id.*).  Plaintiff contends the FBI illegally obtained this information (*id.*).  Plaintiff was apparently charged a $25.00 duplication fee for the documents in his investigative file (*see* doc. 29 at 6).

On December 16, 1999, Defendant Michael Kerensky, a private attorney, contracted with Plaintiff to provide legal representation (doc. 29 at 10).  On April 10, 2000, Attorney Kerensky terminated his representation, because he received information from the FBI, which "he did not believe he could overcome in court" (*id.*).  On May 10, 2000, Plaintiff appeared, without legal

---

the Unit, and advised that he needed to postpone the interview because he was taking pain medication for a back injury, and would reschedule the interview after his doctor's appointment the following week.  Plaintiff alleged he was advised to obtain a letter from his doctor concerning his fitness for duty, as well as a list of drugs prescribed by the doctor.

Plaintiff alleged that on February 17, 1999, he was advised that his interview with the Personnel Security Unit in Washington, D.C. had been rescheduled for the next morning, on February 18, 1999 (doc. 1 at 42).  Plaintiff alleged he was advised that if he did not attend the interview, it would be deemed insubordination.  Plaintiff alleged that he began to feel ill, so he left work for the day without obtaining information about travel to the interview the next day.

[9] In Plaintiff's initial complaint, he alleged that the interview with the Personnel Security Unit was rescheduled for March 2, 1999 (doc. 1 at 43–44).  He alleged that during the interview, he was asked if he had ever used illegal drugs, if he had ever attempted to rape Ms. Mortenson, if he had ever molested a child, and if he had an arrest record as a juvenile.  Plaintiff alleged that the interviewer ordered him to submit to a polygraph examination concerning the issues raised in the interview, but he refused because the test was not in accordance with FBI policies.  Plaintiff alleged that Defendant Ohlson notified him in a letter dated March 3, 1999, that his security clearance was revoked based upon his refusal to complete the security investigation process.  Plaintiff alleged that the letter indicated he may have violated Security Adjudicative Guidelines for Sexual Behavior, Criminal Conduct, and Personal Conduct (refusal to complete required security forms, releases, or provide full, frank, and truthful answers to lawful questions of investigators, security officials, or other official representatives in connection with a personnel security or trustworthiness determination).

representation, at a meeting and hearing before the Access Review Committee ("ARC") of the Department of Justice (doc. 29 at 7).[10]  The ARC denied Plaintiff's appeal (*see id.*).

On August 2, 2000, Defendant Jim Peacock, a private attorney, contracted with Plaintiff to represent him in an employment discrimination matter he initiated with the Equal Employment Opportunity Commission ("EEOC") (doc. 29 at 7).  A hearing before EEOC Lead Administrative Judge Mona Read was scheduled for August 10, 2000 (*id.*).  On August 9, 2000, the day before the hearing, Attorney Peacock advised Plaintiff to request cancellation of the hearing (*id.*).  Attorney Peacock further advised that he would represent Plaintiff in a federal lawsuit (*id.*).  After Plaintiff filed a Request for Cancellation, Peacock advised Plaintiff that he would no longer provide legal representation (*id.*).

On October 3, 2000, Defendant Edward Shubert, an FBI Security Programs Manager, sent a letter to Defendant John Vail, Chairman of the ARC, regarding justification for revocation of Plaintiff's security clearance (doc. 29 at 7).  Shubert enclosed a copy of medical records of Plaintiff's daughter, Ranita Fortenberry (*see id.*; *see also* doc. 1 at 4).  On December 13, 2000, Defendant Vail sent a letter to Defendant Shubert affirming the denial of Plaintiff's security clearance, based upon guidelines for sexual behavior, criminal behavior, and personal behavior (doc. 29 at 6).

Plaintiff was permanently removed from employment with the FBI on January 4, 2001, pursuant to 28 U.S.C. § 536 (doc. 29 at 6).

On November 10, 2009, Plaintiff was stopped and arrested by an officer of the New Orleans Police Department for reckless driving (doc. 29 at 8).  The charge was later dropped (*id.*).

On March 5, 2012, Plaintiff received a Physician's Medical Recommendation under Proposition 215 of the California Health and Safety Code, approving his use of medical marijuana (doc. 29 at 8).  Defendant Attorney General Eric Holder authorized an entry in the National Instant Criminal Background Check System ("NICBCS") indicating that Plaintiff was a user of illegal drugs (*id.*).

---

[10] The Access Review Committee reviews all appeals from denials or revocations of eligibility for access to classified information (throughout his complaint, Plaintiff refers to this as his "security clearance").  *See* 28 C.F.R. § 17.15.

On June 19, 2012, officers of the United States Customs and Border Protection ("CBP"), an agency led by Defendant R. Gil Kerlikowske, detained, searched, and arrested Plaintiff in Texas, based upon the information that had been entered in the NICBCS regarding his illegal use of drugs (doc. 29 at 8; *see also* doc. 1 at 11).  Plaintiff was charged with felony possession of marijuana in Hudspeth County, Texas (doc. 29 at 8–9; *see also* doc. 1 at 11–12).  Between June 19, 2012 and May 16, 2013, CBP officers stopped and attempted to search Plaintiff's vehicle on two more occasions (on June 22, 2012, in New Mexico, on February 15, 2013, in Texas) (doc. 29 at 8; *see also* doc. 1 at 11).  CBP officers in Texas searched Plaintiff's vehicle in May of 2013, while Plaintiff was en route to the final hearing in his criminal case in Hudspeth County (doc. 29 at 8; *see also* doc. 1 at 11–12).  After a canine searched Plaintiff's vehicle, the officer issued Plaintiff a warning ticket and released him (*id.*).  On May 16, 2013, Plaintiff was convicted, pursuant to a guilty plea, of misdemeanor possession of marijuana (doc. 29 at 9; *see also* doc. 1 at 12).

On November 26, 2012, an owner of a private gun store advised Plaintiff that he would not sell him a firearm due to an entry in the NICBCS, which reported that Plaintiff had violated 18 U.S.C. § 922 and was an unauthorized user of a controlled substance (at that time, Plaintiff had been arrested and charged with felony possession of marijuana in Hudspeth County, Texas (*see* doc. 1 at 12)) (doc. 29 at 8).  On November 2, 2013, another private pawn shop "seized" Plaintiff's firearm based upon an NICBCS entry stating that Plaintiff violated 18 U.S.C. § 922 and possessed a "medical marijuana card" (*id.* at 6).

Plaintiff commenced this action on November 24, 2014 (*see* doc. 1).  In his Fifth Amended Complaint, he asserts twelve claims against Defendants, which will be analyzed *infra* (*see* doc. 29 at 11; doc. 29-1).  He seeks monetary damages against Defendants, in the total amount of $100,000,000.00 (doc. 29 at 11).

II.    ANALYSIS

A.    Standard of Review

Because Plaintiff is proceeding in forma pauperis, the court may dismiss a claim if satisfied that it is "(i) frivolous or malicious;  (ii) fails to state a claim on which relief may be granted;  or (iii) seeks monetary relief against a defendant who is immune from such relief."   28 U.S.C. § 1915(e)(2)(B).  Dismissals for failure to state a claim are governed by the same standard as Federal

Rule of Civil Procedure 12(b)(6).  Mitchell v. Farcass, 112 F.3d 1483, 1485 (11th Cir. 1997).  The allegations of the complaint are taken as true and are construed in the light most favorable to Plaintiff.  Davis v. Monroe Cnty. Bd. Of Educ., 120 F.3d 1390, 1393 (11th Cir. 1997).  To survive § 1915(e)(2)(B)(ii), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted).  A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Plausibility means "more than a sheer possibility that a defendant has acted unlawfully."  Id.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (internal quotation marks omitted).

The determination of whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679 (citation omitted).  The pleader is not entitled to relief "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  Id. (citing Fed. R. Civ. P. 8(a)(2)).  The court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Id. at 678 (quotation and citation omitted).  And "bare assertions" that "amount to nothing more than a formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true."  Id. at 681 (quotation and citation omitted).  Stated succinctly:

> Pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

  B. Plaintiff's Claims

    Claim 1:  Violations of 5 U.S.C. § 8120

Plaintiff claims that Defendants Attorney General Holder, Secretary of Labor Perez, FBI Assistant Special Agent in Charge Lowe, and FBI Special Agent Wiltz conspired to circumvent 5

U.S.C. § 8120 by "replacing the original form with fraudulent information" (doc. 29-1 at 2).
Plaintiff specifically alleges the following:

> On May 19, 1997, Defendant Zachary Lowe, an FBI Assistant Special Agent in
> Charge ("ASAC"), sent a cover letter to the Office Workers' Compensation Program
> ("OWCP") of the Department of Labor, enclosing a Federal Notice of Traumatic
> Injury and Claim for Continuation of Pay/Compensation form which had been
> "altered" by Defendant Floyd Wiltz, an FBI Special Agent.  Plaintiff's direct
> supervisor, James Bernazzani, prepared the original form on February 20, 1997 and
> sent it to FBI headquarters prior to the alteration.

(doc. 29 at 6).

> Section 8120 of Title 5 of the United States Code provides:

> Immediately after an injury to an employee which results in his death or probable
> disability, his immediate superior shall report to the Secretary of Labor.   The
> Secretary may–

>> (1) prescribe the information that the report shall contain;

>> (2) require the immediate superior to make supplemental reports; and

>> (3) obtain such additional reports and information from employees as are
>> agreed on by the Secretary and the head of the employing agency.

5 U.S.C. § 8120.

Plaintiff's allegations do not plausibly suggest that either Attorney General Holder or
Secretary of Labor Perez participated in the alleged violation of 5 U.S.C. § 8120.  Further, his
allegations fail to suggest that either Lowe or Wiltz violated 5 U.S.C. § 8120.  Plaintiff admits that
neither of these Defendants was his immediate supervisor, and neither of them worked for the
Secretary of Labor; therefore, neither of them had duty under that statute.  Plaintiff has not stated
a plausible claim for relief based upon an alleged violation of  5 U.S.C. § 8120; therefore, his claims
under 5 U.S.C. § 8120 should be dismissed, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).[11]

<u>Claim 2:  Violations of 5 U.S.C. § 552a, the Privacy Act</u>

---

[11] To the extent Plaintiff challenges the Secretary of Labor's denial of his claim under the Federal Employees'
Compensation Act, 5 U.S.C. § 8101 *et seq.*, his claim is not subject to judicial review.  Claims arising under the Federal
Employees' Compensation Act must be submitted to the Secretary of Labor for resolution and the action of the Secretary
or his designee in allowing or denying a payment under the Act is "not subject to review by another official of the United
States or by a court by mandamus or otherwise."  Title 5 U.S.C. § 8128(b)(2); <u>Bailey v. United States, Through Dep't
of Army</u>, 451 F.2d 963, 965 (5th Cir. 1971); <u>Grijalva v. United States</u>, 781 F.2d 472, 474 (5th Cir. 1986).

Plaintiff claims that Defendants Attorney General Holder, Access Review Committee Chairman Vail, and FBI Security Programs Manager Shubert knowingly and willingly disclosed material to persons and  agencies not entitled to receive it, maintained records without meeting the statutory notice requirement, and willfully requested or obtained records under false pretenses, in violation of the Privacy Act (doc. 29-1 at 2).

To the extent Plaintiff brings claims against Defendants Holder, Vail, and Shubert directly under the Privacy Act, his claims are barred.  The Privacy Act provides that an individual may bring a civil action against a federal <u>agency</u> whenever any agency:

> (C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

> (D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

5 U.S.C. § 552a(g)(1).  Here, Plaintiff does not name any federal agency as a Defendant; instead, he names only individual federal actors.  Therefore, he failed to state a plausible claim for relief against Defendants Holder, Vail, and Shubert under the Privacy Act.

Moreover, a civil action brought under the Privacy Act must be brought within two years from the date on which the cause of action arises, except that where an agency "has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section," the action may be brought at any time within two years after discovery by the individual of the misrepresentation.  *See* 5 U.S.C. § 552a(g)(5).  A cause of action "arises" under the Privacy Act when the aggrieved individual knows or has reason to know of the alleged violation.  <u>Davis v. U.S. Dep't of Justice</u>, 204 F.3d 723, 726 (7th Cir. 2000); *see also* <u>Doe v. Nat'l Sec. Agency</u>, 165 F.3d 17 (4th Cir. 1998).

The allegations underlying Plaintiff's Privacy Act claims against Defendants Vail and Shubert concern information collected, maintained, and disclosed during the OPR investigations and proceedings to revoke his "top secret security clearance" (*see* doc. 29 at 6–7).  However, Plaintiff's allegations in his initial complaint demonstrate that in May of 1999, Plaintiff was aware that

allegedly inaccurate, irrelevant, or incomplete information was included in his security investigation file, because at that time he obtained the documents included in that file, which he describes as "full of outright lies, blatant distortions of facts, presentation of rumors and hearsay statements, . . . psychological predictions and presumptions . . ., distortions of statements made by individuals, statements made which conflict with other evidence presented in these documents, and a host of other irregularities" (doc. 1 at 46).  Thus, Plaintiff had reason to know of his Privacy Act claims against the FBI in May of 1999.  Although Plaintiff alleges the FBI redacted some information from those records (*see* doc. 29-1 at 3), it is obvious from his description of the documents (i.e., that they were full of lies, distortions of fact, irregularities, etc.) that he was aware of the alleged inaccuracies at that time.  Plaintiff did not commence the instant lawsuit until November 24, 2014 (*see* doc. 1).  Therefore, his Privacy Act claims are clearly time-barred.

To the extent Plaintiff attempts to bring a Privacy Act claim based upon information in the National Crime Information Center system,[12] the Privacy Act expressly exempts this information from a civil action under the Act.  *See* 28 C.F.R. § 1696(g).

To the extent Plaintiff attempts to bring constitutional claims, as opposed to claims directly under the Privacy Act, regarding Defendants' improper  disclosing, maintaining, and obtaining information in his records, his <u>Bivens</u> claims are precluded by the Privacy Act.  *See* <u>Downie v. City of Middleburg Heights</u>, 301 F.3d 688 (6th Cir. 2002) (Privacy Act barred <u>Bivens</u> First Amendment retaliation claim by former undercover informant for Customs Service against federal officials alleging creation, maintenance, and dissemination of allegedly defamatory "blackball" memo in retaliation for charges of corruption contained in informant's resignation letter; Privacy Act provided comprehensive legislative scheme that provided meaningful remedy for wrong alleged); <u>Sudnick v. Dep't of Defense</u>, 474 F. Supp. 2d 91 (D.D.C. 2007) (comprehensive remedial scheme provided by the Privacy Act precluded <u>Bivens</u> claim brought by former senior advisor to the Iraqi Ministry of Communications under the Coalition Provisional Authority against former Department of Defense (DOD) official, which alleged that official violated the senior advisor's Fifth Amendment due process rights by publicly stigmatizing him through a campaign of making false representations and

---

[12] In Plaintiff's initial complaint, he alleged that Defendants violated his "privacy rights" by reporting false information in the NICBCS (*see* doc. 1 at 10–13).

allegations; <u>Bivens</u> claim was based entirely on DOD official's alleged disclosure of Privacy Act-covered information pertaining to senior advisor); <u>Hatfill v. Ashcroft</u>, 404 F. Supp. 2d 104 (D.D.C. 2005) (due to remedy available under Privacy Act, subject of Department of Justice (DOJ) criminal investigation could not maintain <u>Bivens</u> due process claim against DOJ and FBI officials and agents arising from alleged campaign of harassment, including intimidation, defamatory public statements, defamatory statements to employers, and retaliation for subject's public statements and filing of administrative complaint; although subject contended that not all of his claims of damage to his property rights were redressable via the Privacy Act, the Act was a comprehensive legislative scheme providing meaningful remedy for the kinds of harm alleged); <u>Mittleman v. U.S. Treasury</u>, 773 F. Supp. 442 (D.D.C. 1991) (former government employee's constitutional damage claims relating to disclosure of false information in her records were precluded by the Privacy Act). Therefore, Plaintiff may not maintain an action for damages under <u>Bivens</u> based upon violations of the Privacy Act.

Claim 3:  Violations of 28 U.S.C. § 535

Plaintiff claims that Defendant Attorney General Holder violated 28 U.S.C. § 535(a) by permitting FBI officers and employees to investigate him for "allegations and crimes" that did not relate to violations of federal criminal law (doc. 29-1 at 3).  He contends Section 535 authorizes the Attorney General and the FBI to investigate only violations of federal criminal law involving officers and employees of the federal government; therefore, the FBI's investigations were not authorized.  *See* 28 U.S.C. § 535(a).[13]

The FBI is authorized to "[c]onduct personnel investigations requisite to the work of the Department of Justice . . . ."  28 C.F.R. § 0.85(c).  Additionally, federal regulations provide that

---

[13] That section provides:

(a) The Attorney General and the Federal Bureau of Investigation may investigate any violation of Federal criminal law involving Government officers and employees--

    (1) notwithstanding any other provision of law; and

    (2) without limiting the authority to investigate any matter which is conferred on them or on a department or agency of the Government.

28 U.S.C. § 535(a).

employees of the Department of Justice, of which the FBI is the principal investigative arm, may be reviewed to determine whether they meet the standards for access to classified information set forth in section 3.1 of Executive Order 12968.  *See* 28 C.F.R. § 17.47(a).  Federal regulations provide a process by which an employee may request review and appeal of any determination regarding his eligibility for access to classified information, via the Access Review Committee.  *See id.* §§ 17.47(b)–(g).

Plaintiff's allegations fail to plausibly suggest that the OPR investigations were unauthorized.  Therefore, this claim is subject to dismissal under 28 U.S.C. § 1915(e)(2)(B)(ii).

Claim 4:  Violation of 28 U.S.C. § 2462

Plaintiff claims that Attorney General Eric Holder allowed FBI officials to delay the triggering of the five-year limitations period set forth in 28 U.S.C. § 2462 (doc. 29-1 at 3).

Section 2462 of Title 28 of the United States Code provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.  This provision governs enforcement actions brought by the United States, not private individuals.  Therefore, it has no application to this case.

Claims 5–7:  42 U.S.C. §§ 1981, 1983, 1985

In support of his claim under § 1981, Plaintiff argues that Defendants FBI Assistant Special Agent in Charge Charles Venables, FBI Security Programs Manager Ohlson, and FBI Security Programs Manager Shubert interfered with his right to enforce his employment contract with the FBI, and caused impairment of his rights "by nongovernmental, private acts of discrimination executed under color of Texas state laws" (doc. 29-1 at 3).  In support of his § 1983 claim, Plaintiff alleges Defendant Ohlson "under color of state criminal laws" deprived him of unspecified rights, privileges, and immunities secured by the Constitution and "other laws" (*id.*).

Sections 1981 and 1983 do not apply to federal actors.[14]  *See* Lee v. Hughes, 145 F.3d 1272, 1277 (11th Cir. 1998) (affirming dismissal of § 1981 claim by terminated U.S. probation officer: "Both circuit precedent and the text of § 1981 compel us to hold that a plaintiff cannot maintain a § 1981 claim against a federal defendant acting under color of federal law."); *see also, e.g.*, Osahar v. Postmaster General of U.S. Postal Svc., 263 F. App'x 753, 763 (11th Cir. 2008) (unpublished) (Section 1981 and § 1983 did not apply to federal employee's claims against federal agency employer for impairment of equal rights, or violations of federal or constitutional rights, under color of federal law) (citing § 1981, § 1983, and Lee, 145 F.3d at 1275).  All of the Defendants against whom Plaintiff brings claims under § 1981 and 1983 are federal actors.  Therefore, Plaintiff cannot state a plausible claim for relief under § 1981 or 1983.

In support of his § 1985 claim, Plaintiff alleges Defendant Vail (Chairman of the FBI's Access Review Committee) and Defendant Ohlson (FBI Security Programs Manager) conspired to prevent him from performing his duties, and injured his "property and income" by impeding him in

---

[14] Section 1981 provides, in relevant part:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
. . . .
(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981 (emphasis added).

Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . .

42 U.S.C. § 1983 (emphasis added).

the discharge of his duties (doc. 29-1 at 3–4).[15]  Plaintiff also alleges Defendant Venables (FBI Assistant Special Agent in Charge) and Defendant Waterman (Assistant General Counsel for the FBI) conspired and "went on the premises of another" to deprive him of equal rights and equal protection of the law (*id.*).

Plaintiff's claims under § 1985 against Defendants Vail, Ohlson, Venables, and Waterman are barred by the intracorporate conspiracy doctrine.  "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy."  McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc).[16]  "[U]nder the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot

---

[15] Section 1985 provides that in any case of a conspiracy described in that section, if one or more persons does, or causes to be done, any act in furtherance of the object of the conspiracy, "whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States," the injured party may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.  42 U.S.C. § 1985(3).  Section 1985 describes the conspiracies as follows:

> (1) Preventing officer from performing duties
>
> If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

and

> (3) Depriving persons of rights or privileges
>
> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . .

42 U.S.C. § 1985(1), (3).

[16] Because Bivens and § 1983 are substantially similar, the court properly relies on cases considered under § 1983 in analyzing Plaintiff's claims under Bivens. *See* Abella v. Rubino, 63 F.3d 1063, 1065 (11th Cir. 1995) (courts generally apply § 1983 law in deciding Bivens cases); Kelly v. Serna, 87 F.3d 1235, 1239 (11th Cir. 1996) (cases addressing issues raised under 42 U.S.C. § 1983 are equally applicable to claims raised in a Bivens action).

conspire among themselves." *Id.*; *accord* <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1190–91 (11th Cir. 2001) (stating "the only two conspirators identified . . . are both City employees; no outsiders are alleged to be involved" and concluding intracorporate conspiracy doctrine barred plaintiffs' § 1985(3) conspiracy claims for deprivation of their equal protection rights). The question of whether a defendant acted within the scope of his employment is distinct from whether the defendant acted unconstitutionally. <u>Grider v. City of Auburn, Ala.</u>, 618 F.3d 1240, 1261 (11th Cir. 2010). The scope-of-employment inquiry is "whether the employee police officer was performing a function that, but for the alleged constitutional infirmity, was within the ambit of the officer's scope of authority (i.e., job-related duties) and in furtherance of the employer's business." *Id.* "The doctrine applies to public entities." <u>Denney</u>, 247 F.3d at 1190; *see* <u>Rehberg v. Paulk</u>, 611 F.3d 828, 854 (11th Cir. 2010) (concluding intracorporate conspiracy doctrine barred § 1983 conspiracy claim against a county employee); <u>Dickerson v. Alachua Cnty. Comm'n</u>, 200 F.3d 761, 767–68 (11th Cir. 2000) (concluding intracorporate conspiracy doctrine barred plaintiff's § 1985(3) conspiracy claim for interference with his civil rights).

Here, Defendants Vail, Ohlson, Venables, and Waterman were all acting within the scope of their employment with the FBI during their encounters with Plaintiff. Therefore, the intracorporate conspiracy doctrine bars Plaintiff's claims against them.[17] *See, e.g.*, <u>Detris v. Coats</u>, 523 F. App'x 612, 615–16 (11th Cir. 2013) (unpublished) (intracorporate conspiracy doctrine barred arrestee's § 1983 claims against deputies in their individual capacities alleging one deputy instructed

---

[17] In so concluding, the court acknowledges that the Eleventh Circuit has recognized an exception to the intracorporate conspiracy doctrine where a claim "necessarily alleges a criminal conspiracy." <u>McAndrew</u>, 206 F.3d at 1041. Plaintiff claims that Defendants Ohlson and Vail violated § 1985(1) by conspiring to prevent him from the performance of his duties and "injur[ing] Plaintiff's property and income to interrupt, molest, and impede Plaintiff in the discharge of his duties" (doc. 29-1 at 3–4). Plaintiff's factual allegations relevant to Defendants Ohlson and Vail state the following: (1) on February 18, 1999, Defendant Ohlson sent Plaintiff a letter advising that his security clearance was immediately suspended; (2) on August 4, 2000, Defendant Vail sent Ohlson a letter regarding Plaintiff's appeal of the suspension of his security clearance; (3) on October 5, 2000, Vail received a letter from Defendant Security Programs Manager Shubert stating reasons justifying the revocation of Plaintiff's security clearance, and (4) on December 13, 2000, Vail sent Shubert a letter affirming the revocation of Plaintiff's security clearance, based upon guidelines for sexual behavior, criminal behavior, and personal behavior (doc. 29 at 6–7). These allegations do not necessarily allege a criminal conspiracy.

Plaintiff claims that Defendants Venables and Waterman violated § 1985(3) by "conspir[ing] and [going] on the premises of another to deprive Plaintiff of equal rights and equal protection of the laws." (doc. 29-1 at 4). However, Plaintiff's factual allegations do not even mention Waterman, let alone describe conduct that necessarily alleges a criminal conspiracy between Venables and Waterman.

other deputies to use excessive force, and other deputies agreed to do so); Humphrey v. Napolitano, 517 F. App'x 705, 709 (11th Cir. 2013) (unpublished) (intracorporate conspiracy doctrine barred former Customs and Border Protections officer's § 1985 claim against Department of Homeland Security employees alleging employees interfered with his civil rights by placing him on "desk duty" during investigation into accusation that he had behaved in an unprofessional manner following two incidents at an airport); Hollins v. Fulton Cnty., 422 F. App'x 828, 832 (11th Cir. 2011) (unpublished) (intracorporate conspiracy doctrine barred terminated deputy's claim that sheriff and chief deputy sheriff conspired to violated her due process rights).

Plaintiff also brings a § 1985 conspiracy claim against Defendant Jim Peacock (a private attorney) and Defendant Mona Read (Lead Administrative Judge of the Houston District of the EEOC), alleging they conspired to obstruct justice and intimidate him, his witnesses, and his attorney (*id.*).  He specifically alleges:

> On August 2, 2000, Jim L. Peacock contracted with Plaintiff to provide legal services.  On or about August 9, Peacock [ ] and Brad Frye [apparently one of Peacock's associates who is not a named Defendant] told Plaintiff they wanted to cancel the hearing scheduled August 10, to be held before EEOC Judge Mona Read, claiming they would represent me in the federal lawsuit after cancellation.  Plaintiff asked that their intentions to continue representation be spelled out in the request for cancellation.  Peacock added a vague statement of his intentions, but called after the hearing was cancelled and said he would no longer represent the Plaintiff.

(doc. 29 at 7).

The provision of Section 1985 relevant to obstruction of justice and intimidation of parties and witnesses provides, in relevant part:

> (2) Obstructing justice; intimidating party, witness, or juror
>
> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for

      lawfully enforcing, or attempting to enforce, the right of any person, or class of
      persons, to the equal protection of the laws;

42 U.S.C. § 1985(2).  A plaintiff seeking to recover under § 1985(2) must show a nexus between the alleged conspiracy and a federal court proceeding.  *See* Bradt v. Smith, 634 F.2d 796, 800–01 (5th Cir. Unit A Jan. 1981).

      Plaintiff alleges that the Defendant Peacock and EEOC Judge Read conspired against him during administrative EEOC proceedings.  Plaintiff's civil conspiracy claim under 42 U.S.C. § 1985(2) fails because this section applies only to federal court proceedings, not to administrative proceedings before the EEOC.  *See, e.g.*, Morast v. Lance, 807 F.2d 926, 930 (11th Cir. 1987) (concluding that, because the Office of the Comptroller of the Currency was an administrative agency, it was not a federal court for purpose of § 1985(2)); Alhallaq v. Radha Soami Trading, LLC, 484 F. App'x 293, 297 (11th Cir. 2012) (unpublished) (plaintiff could not assert conspiracy claim under § 1985(2) that defendants conspired against her in EEOC proceedings, because proceedings before the EEOC are administrative).

      Plaintiff failed to state a plausible claim for relief under § 1981, § 1983, or § 1985. Therefore, those claims should be dismissed for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

      <u>Claims 8–10:  215 Proposition—California Health and Safety Code 11362.5 and Second and Fourth Amendments to the U.S. Constitution</u>

      Plaintiff claims that Defendant Attorney General Holder "allowed the entry of Plaintiff's record" in the NICBCS indicating that Plaintiff possessed a "medical marijuana card," which caused him to be subjected to "undue, illegally obtained, criminal prosecutions and sanctions" and resulted in the violation of his Second Amendment right to bear arms (doc. 29-1 at 4).  He claims that Defendant R. Gil Kerlikowski, Commissioner of the United States Customs and Border Protection, authorized his officers to "profile" and stop California motorists and medical marijuana patients. This claim relates to Plaintiff's allegations that:  (1) he was stopped and arrested by law enforcement in Texas on June 19, 2012, based upon an NICBCS entry indicating he had been issued a medical marijuana card in California, and as a result of the stop, he was convicted of misdemeanor possession of marijuana in Hudspeth County, Texas, on May 16, 2013; and (2) licensed firearms dealers refused to sell/transfer a firearm to him on November 26, 2012, and November 2, 2013,

based upon an entry in the NICBCS that he was an unlawful drug user, pursuant to 18 U.S.C. § 922 (*see* doc. 29 at 6, 8).

Plaintiff's claim that his classification as an unlawful drug user in the NICBCS violated his Second Amendment rights is unavailing.  Section 922 of Title 18 of the United States Code prohibits a licensed firearms importer, manufacturer, or dealer from transferring a firearm to any other person who is not a licensed importer, manufacturer, or dealer unless, before the completion of the transfer, the licensee contacts the national instant criminal background check system, and either (1) the system provides the licensee with a unique identification number; or (2) 3 business days have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of Section 922.  *See* 18 U.S.C. § 922(t).  Subsection (g) of § 922 makes it unlawful for any person who is an unlawful user of a controlled substance (as defined in 21 U.S.C. § 802) to receive or possess a firearm.  *See* 18 U.S.C. § 922(g)(3).  Subsection (n) makes it unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to receive a firearm.  *See* 18 U.S.C. § 922(n).

Plaintiff alleges that at the time he attempted to receive firearms from licensed dealers, in November of 2012 and November of 2013, he  had a "medical marijuana card."[18]  The definition of "unlawful user" excludes any person using a controlled substance in a manner "as prescribed by a licensed physician."  27 C.F.R. § 478.11.[19]  However, marijuana is categorized by federal law as

---

[18] Plaintiff states he received a Physician's Medical Recommendation approving his for use of marijuana on March 5, 2012 (doc. 29 at 8).

[19] That federal regulation expressly defines "[u]nlawful user of or addicted to any controlled substance" as:

A person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician.  Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct.  A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm.  An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year; multiple arrests for such offenses within the past 5 years if the most recent arrest occurred within the past year; or persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the

a Schedule I controlled substance under 21 U.S.C. § 812(c) (Schedule I)(c)(10).  Controlled substances in Schedule I are defined by statute as having "no currently accepted medical use in treatment in the United States." 21 U.S.C. § 812(b)(1)(B).  There is no provision under Federal law that permits any class of the general public to lawfully possess marijuana, including those wishing to use marijuana for medical purposes.  *See* 21 U.S.C. § 823(f) (providing an exception to the ban on possession of Schedule I drugs for federally approved research projects); *see also* Gonzales v. Raich, 545 U.S. 1, 14, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005) ("By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the . . . possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration pre-approved research study.").  The Controlled Substances Act expressly recognizes that "there is a lack of accepted safety for use of [marijuana] under medical supervision." 21 U.S.C. § 812(b)(1)(A)–(C), § 829; *see also* United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 491, 121 S. Ct. 1711, 149 L. Ed. 2d 722 (2001) (recognizing the statutory determination that "marijuana has no medical benefits worthy of an exception (outside the confines of a Government-approved research project)").  Thus, marijuana users necessarily are "unlawful users" for purposes of § 922(g)(3), and a policy or regulation that identifies holders of medical marijuana cards as unlawful drug users, is consistent with 18 U.S.C. § 922(g)(3).  Every circuit court to have considered the issue of the constitutionality of § 922(g)(3) under the Second Amendment has affirmed its constitutionality.  *See* United States v. Carter, 750 F.3d 462 (4th Cir. 2014); United States v. Dugan, 657 F.3d 998, 999 (9th Cir. 2011); United States v. Yancey, 621 F.3d 681, 682 (7th Cir. 2010) (per curiam); United States v. Seay, 620 F.3d 919, 924–25 (8th Cir. 2010); United States v. Patterson, 431 F.3d 832, 835–36 (5th Cir. 2005); *see also, e.g.*, United States v. Richard, 350 F. App'x 252, 260 (10th Cir. 2009).  Therefore, Plaintiff's allegations fail to state a plausible Second Amendment violation.

The basis of Plaintiff's Fourth Amendment claim is that the stop and search of his vehicle by federal border patrol officials in Texas in 2012, which led to his arrest and conviction for marijuana possession in Hudspeth County, Texas in May of 2013, was unlawful, because his status

---

past year.

27 C.F.R. § 478.11

as a medical marijuana user did not provide sufficient probable cause for the stop and search of his vehicle (doc. 29-1 at 4). Plaintiff contends the marijuana found during the allegedly illegal search of his vehicle was subject to suppression, pursuant to the "exclusionary rule."

The Fourth Amendment protects the right to be free from "unreasonable searches and seizures," but it is silent about how this right is to be enforced. *See* Davis v. United States, — U.S. —, 131 S. Ct. 2419, 2423, 180 L. Ed. 2d 285 (2011). To justify a traffic stop, which is a type of seizure, officers need only "reasonable suspicion"—that is, "a particularized and objective basis for suspecting the particular person stopped" of breaking the law. Prado Navarette v. California, 572 U.S. ——, ——, 134 S. Ct. 1683, 1687–88, 188 L. Ed. 2d 680 (2014) (internal quotation marks omitted). To supplement the bare text of the Fourth Amendment, the Supreme Court created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation. *Id.*

In Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994), the Supreme Court held:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. at 486–87.

Whether Heck bars an action after the plaintiff has been released from custody, which is the case here, is unsettled. *See* Rolle v. Dilmore, No. 4:14cv339/RH/CAS, 2014 WL 6882634, at *2 (N.D. Fla. Dec. 3, 2014) (unpublished) (citing Ferenc v. Haynes, 4:10cv138–RH/WCS, 2010 WL 4667569 (N.D. Fla. Nov. 9, 2010) (unpublished) (collecting cases)). The majority opinion in Heck can be read to suggest that the favorable-termination requirement is an element of any § 1983 action alleging unconstitutional conviction, regardless of whether the conviction led to confinement, and

regardless of whether any confinement continued when the § 1983 action was filed.  512 U.S. at 483–484.  The Heck Court was not presented with such facts, but the majority acknowledged the possibility that even a released prisoner might not be permitted to bring a § 1983 action implying the invalidity of a conviction or confinement without first satisfying the favorable-termination requirement.  *Id.* at 490, n.10.  However, in a concurring opinion in Heck, and in both concurring and dissenting opinions of five justices in the subsequent case of Spencer v. Kemna, 523 U.S. 1, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998), members of the Court expressed the view that unavailability of federal habeas may dispense with the Heck favorable-termination requirement.  *See* Heck, 512 U.S. at 491 (Souter, J., concurring in judgment); Spencer, 523 U.S. at 19 (Souter, J., concurring for four justices) ("Heck did not hold that a released prisoner . . . is out of court on a § 1983 claim, and . . . it would be unsound to read either Heck or the [federal] habeas statute as requiring any such result."); *id.* at 25 (Stevens, J., dissenting) (agreeing with Justice Souter on this point).

The Eleventh Circuit has given conflicting signals on this issue.  *See* Harden v. Pataki, 320 F.3d 1289 (11th Cir. 2003) (holding that Heck did not apply on the facts, because the plaintiff's success on the Fourth Amendment issue did not necessarily imply the invalidity of his conviction; but then, citing Spencer, concluding that Heck did not apply for a "second reason"—that Heck does not bar an action if a habeas remedy is unavailable); *see also* Abusaid v. Hillsborough County Board of County Commissioners, 405 F.3d 1298, 1315 n.9 (11th Cir. 2005) (citing Spencer and noting in dicta that the Eleventh Circuit had not "weighed in on this issue" of whether Heck barred a civil rights action if a habeas remedy was unavailable).

In unpublished decisions, the Eleventh Circuit has applied Heck to plaintiffs who were not in custody.  *See* Reilly v. Herrera, — F. App'x —, 2015 WL 4508750, at *2– 3 (11th Cir. July 27, 2015) (concluding that the plaintiff's § 1983 action was barred by Heck, because his success on the Fourth Amendment issue would necessarily imply the invalidity of his conviction, and declining to consider the assertion that his claim should be allowed to proceed because federal habeas relief was unavailable, but expressing doubt that Justice Souter intended to propose a broad exception to include prisoners who had the opportunity to challenge their underlying convictions but failed to do so); Christy v. Sheriff of Palm Beach County, Florida, 288 F. App'x 658, 666 (11th Cir. 2008) (concluding that the plaintiff's § 1983 action was barred by Heck, because his success on the Fourth

Amendment issue would necessarily imply the invalidity of his conviction, and declining to consider the assertion that his claim should be allowed to proceed because federal habeas relief was unavailable); Vickers v. Donahue, 137 F. App'x 285, 287 (11th Cir. 2005) (concluding that the plaintiff's § 1983 claim was barred under Heck because it would necessarily undermine his underlying conviction, and declining to address the issue of the unavailability of habeas relief); *cf.* Koger v. Florida, 130 F. App'x 327 (11th Cir. 2005) (concluding that the plaintiff's § 1983 claim was barred under Heck because it would necessarily undermine the state court's finding that plaintiff was guilty of a traffic infraction, and not addressing the issue of the unavailability of habeas relief, even though the plaintiff almost surely was not in custody at the time he commenced the § 1983 action).

Additionally, here, unlike in Harden, Plaintiff's claim would necessarily imply the invalidity of his conviction.  But for the allegedly illegal stop and search of Plaintiff's vehicle, the marijuana, which was the subject of the drug possession charge, would not have been discovered and seized. Therefore, Plaintiff's conviction for possession of that marijuana would be necessarily undermined by a successful Fourth Amendment claim concerning the stop and search. *See* Weaver v. Geiger, 294 F. App'x 529, 533 (11th Cir. 2008) (unpublished) (barring under Heck a Fourth Amendment claim where plaintiff's conviction for possession with intent to distribute methadone derived from search under warrant which, if proven unconstitutional, would have undermined the validity of an essential element of the offense for which plaintiff was found guilty); Baxter v. Crawford, 233 F. App'x 912, 915–16 (11th Cir. 2007) (unpublished) (barring under Heck a civil rights claim alleging illegal search and seizure for an individual convicted of cocaine distribution and possession, since such an action would attack the factual basis for his conviction).

In sum, following the position taken in Christy and Vickers, *supra*, this court concludes that because Plaintiff's Fourth Amendment claim would necessarily undermine his conviction for possession of marijuana, and is thus barred by Heck, the court may decline to address the issue of the availability of federal habeas relief.[20]  Therefore, Plaintiff's Fourth Amendment claim should be dismissed.  *See* Domotor v. Wennet, 630 F. Supp. 2d 1368, 1380 (S.D. Fla. 2009), *aff'd*, 356 F.

---

[20] Plaintiff could have challenged his conviction by means of direct appeal.  *See* Tex. Code Crim. Proc. Ann. art. 44.02 (West 1977).

App'x 316 (11th Cir. 2009) (<u>Heck</u> applied even though § 1983 plaintiff was not a prisoner and thus had no recourse under federal habeas statute); *see also, e.g.,* <u>Drayer v. Delaware</u>, 173 F. App'x 997, 998–99 (3d Cir. 2006) (unpublished) (same); <u>Henry v. City of Mt. Dora</u>, No. 5:13-cv-528-Oc-30PRL, 2014 WL 5823229, at *6–9 (M.D. Fla. Nov. 10, 2014) (unpublished) (same); <u>Baer v. Sapp</u>, No. 5:11cv248/MMP/CJK, 2011 WL 9154681, at *6 (N.D. Fla. Dec. 29, 2011), *Report and Recommendation Adopted by* <u>Baer v. Abel</u>, No. 5:11cv248/MMP/CJK, 2012 WL 4466349 (N.D. Fla. Sept. 26, 2012) (unpublished) (same); <u>Thro v. Bagwell</u>, No. 5:08cv120/RS/EMT, 2011 WL 3925040, at *6 (N.D. Fla. Aug. 9, 2011), *Report and Recommendation Adopted by* 2011 WL 3925031 (N.D. Fla. Sept. 7, 2011) (unpublished) (same); <u>Harris v. Milgram</u>, No. 10-0791 (RBK), 2010 WL 760584, at *12 (D.N.J. Mar. 2, 2010) (unpublished) (same); <u>Heilman v. T.W. Ponessa and Assoc.</u>, No. 4:07-cv-1308, 2008 WL 275731, at *7 (M.D. Penn. Jan. 30, 2008) (unpublished) (same); <u>Tobin v. Bodman</u>, No. 1:06-492-RBH, 2007 WL 1068253, at *4 (D.S.C. Mar. 29, 2007) (unpublished) (same); <u>Bilal v. City of Pensacola</u>, No. 3:05cv366/LAC/MD, 2006 WL 173692, at *6 (N.D. Fla. Jan. 24, 2006) (unpublished) (same). *But see* <u>Ray v. Judicial Corr. Serv.</u>, No. 2:12-cv-02819-RDP, 2013 WL 5428395, at *8 (N.D. Ala. Sept. 26, 2013) (unpublished) (<u>Heck</u> did not bar § 1983 action because none of the plaintiffs were incarcerated when the suit was filed and their prior stints in jail were too fleeting to permit the filing and resolution of a federal habeas suit).

<u>Claim 11:  U.S. Constitution—Fifth Amendment</u>

Plaintiff claims that Defendants Michael Wilson and Michael Ward violated his Fifth Amendment due process rights during the course of the OPR investigations in which they were involved (doc. 29-1 at 4–5).  Specifically, Plaintiff alleges that during the 1993 OPR investigation, Defendant Special Agent in Charge Michael Wilson falsely reported that the Houston District Attorney declined to present evidence to the grand jury of the allegations involving Plaintiff and his daughter which were investigated by the child protective services agency.  Plaintiff states he and his attorney "appeared outside the scheduling grand jury hearing and learned the case was 'no billed'" (doc. 29 at 9).  In other words, the prosecutor presented evidence to the grand jury, but the grand jury found it insufficient to support an indictment.  Plaintiff contends Wilson's misrepresentation was an attempt to "circumvent the clauses for double jeopardy, self-incrimination, grand jury screening, and due process" (*id.* at 15).  As to Defendant OPR Investigator Ward, Plaintiff alleges

that during the 1998 OPR investigation, Ward "conducted interviews" in violation of "the Fifth Amendment clauses for double jeopardy, self-incrimination, grand jury screening, and due process" (*id.* at 16).

Plaintiff's claims under the Fifth Amendment's double jeopardy and grand jury clauses are entirely implausible. The Fifth Amendment provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, . . . ; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; . . . .

U.S. Const. amend. V.

The Grand Jury Clause applies, by its express terms, only to criminal proceedings. Similarly, the Fifth Amendment's double jeopardy clause does not apply to a federal employer's disciplinary proceedings involving one of its employees. *See* United States v. Reed, 937 F.2d 575, 578 (11th Cir. 1991) (disciplinary suspension imposed upon government employee did not serve as punishment for double jeopardy purposes and thus did not bar, on double jeopardy grounds, subsequent embezzlement prosecution based upon same underlying conduct); *see also* United States v. Camacho, 413 F.3d 985 (9th Cir. 2005); United States v. McAllister, 119 F.3d 198, 200–01 (2d Cir. 1997); United States v. Wingate, 128 F.3d 1157, 1163 (7th Cir. 1997); United States v. Reyes, 87 F.3d 676, 680 (5th Cir. 1996); United States v. Payne, 2 F.3d 706, 710 (6th Cir. 1993).

Additionally, Plaintiff's claims under the self-incrimination clause, and any other due process challenges to the OPR proceedings in which Defendants Wilson and Wade were involved, are barred by the statute of limitations. Bivens suits have the same statute of limitations as suits brought under 42 U.S.C. § 1983. *See* Kelly v. Serna, 87 F.3d 1235, 1238 (11th Cir. 1996). In cases in which Florida is the forum state, as here, a § 1983 or Bivens plaintiff has four years to file suit.[21] *See* Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003). "[U]nder our Bivens case law, an action accrued at the time the plaintiff knew or had reason to know of his claims." Uboh v. Reno, 141 F.3d 1000, 1002 (11th Cir. 1998). Accordingly, this action accrued at the time Plaintiff knew or had

---

[21] In Texas, the applicable limitations period for a due process claim under § 1983 or Bivens is two years. *See* Price v. City of San Antonio, 431 F.3d 890, 892 (5th Cir. 2005); Tex. Civ. Prac. & Rem. Code Ann. § 16.003.

reason to know of his due process claims, and he had four years from that date in which to commence suit.

Plaintiff states that Defendant Wilson's alleged false report occurred on December 21, 1993, as part of the OPR investigation generated by the child abuse allegation involving Plaintiff's daughter (doc. 29 at 9).  Plaintiff states he was interviewed during the course of that OPR investigation in February of 1994, and the investigation concluded in June of 1994, when he received a letter of censure and disciplinary probation for failing to report off-duty contact with a police officer (*see* doc. 1 at 24–25).  Plaintiff knew or had reason to know of Defendant Wilson's investigative report during the course of the investigation, and certainly by the time it concluded in June of 1994. With regard to Defendant Ward, Plaintiff states that Ward's allegedly unconstitutional conduct occurred during his interviews with Plaintiff in October of 1998 (doc. 29 at 9).  At that time, Plaintiff knew or had reason to know of the due process claims arising from those interviews. Plaintiff did not commence the instant action until November 24, 2014, well beyond the four-year limitations period for Bivens claims arising from the alleged due process violations that occurred during the OPR investigations in 1994 and 1998.  Therefore, Plaintiff's due process claims are time-barred.

Claim 12:  U.S. Constitution—Sixth Amendment

Plaintiff claims he was denied the Sixth Amendment right to assistance of counsel and the right to confront witnesses during the proceedings to revoke his security clearance, which proceedings resulted in the revocation of his security clearance on December 13, 2000 (doc. 29-1 at 5).  He claims that Defendant Michael Kerensky, a private attorney, breached his contract for legal representation during those proceedings (*id.*).

The proceedings which resulted in the revocation of Plaintiff's security clearance were administrative, rather than criminal, in nature; therefore, the Sixth Amendment protections did not apply.  *See* Austin v. United States, 509 U.S. 602, 608, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993) ("[t]he protections provided by the Sixth Amendment are explicitly confined to 'criminal prosecutions.'"); Elliott v. S.E.C., 36 F.3d 86, 88 (11th Cir. 1994) ("there is no statutory or constitutional right to counsel in an administrative proceeding of this kind"); *see also, e.g.,* Branch v. Franklin, 285 F. App'x 573, (11th Cir. 2008) (unpublished) (taxicab driver's lack of

court-appointed attorney at administrative hearing where he was allegedly not allowed to present legal arguments regarding his citation for wearing shorts while driving taxicab, as prohibited by city's dress code ordinance, did not deprive driver of Sixth and Fourteenth Amendment rights, since there was no statutory or constitutional right to counsel in administrative proceeding for nonfelony charge with no term of imprisonment imposed); <u>Center for Participant Education v. Marshall</u>, 337 F. Supp. 126, 137 (N.D. Fla. 1972) (Sixth Amendment right to counsel did not apply to student disciplinary proceeding); <u>Barker v. Hardway</u>, 283 F. Supp. 228, 237 (S.D.W.V. 1968) (Sixth Amendment's guarantee of right to counsel in criminal and semi-criminal cases has no application to matters of purely a civil nature); <u>Grabinger v. Conlisk</u>, 320 F. Supp. 1213, 1218 (N.D. Ill. 1970) (police department disciplinary proceeding with respect to policemen against whom a charge of excessive force had been lodged could not be classified as criminal or even quasicriminal, and the Sixth Amendment did not guarantee right to counsel at such proceedings).  Therefore, Plaintiff failed to state a plausible Sixth Amendment claim.

With regard to Plaintiff's state law breach-of-contract claim against Attorney Kerensky, the court should decline to exercise supplemental jurisdiction over this claim.  It is well established that once a plaintiff's federal claims are dismissed, there remains no independent federal jurisdiction to support the court's exercise of supplemental jurisdiction over state claims against a defendant.  *See* <u>Baggett v. First Nat'l Bank of Gainesville</u>, 117 F.3d 1342, 1352 (11th Cir. 1997).  Title 28 U.S.C. § 1367(c)(3) provides that the district court may decline to exercise supplemental jurisdiction over claims after it has dismissed all claims over which it has original jurisdiction.  *See also* <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725–26, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).  Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction.  <u>Baggett</u>, 117 F.3d at 1353 (citing <u>Palmer v. Hosp. Auth. of Randolph Cnty.</u>, 22 F.3d 1559, 1569 (11th Cir. 1994); <u>Exec. Software N. Am. v. U. S. Dist. Court</u>, 15 F.3d 1484, 1493 (9th Cir. 1994); <u>New England Co. v. Bank of Gwinnett Cnty.</u>, 891 F. Supp. 1569, 1578 (N.D. Ga. 1995); <u>Fallin v. Mindis Metals, Inc.</u>, 865 F. Supp. 834, 841 (N.D. Ga. 1994)).  Taking these factors into account in this case, the undersigned concludes that any state law claims asserted by Plaintiff, should be dismissed to permit him to pursue them in a more

appropriate forum.  The state court is best equipped to research and rule on matters of state law, and comity would suggest that it should be allowed to do so.

III.    CONCLUSION

Plaintiff's allegations fail to state a plausible federal claim on which relief may be granted; therefore, his federal claims should be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Additionally, the court should decline to exercise supplemental jurisdiction over any state law claims asserted by Plaintiff; therefore, those claims should be dismissed without prejudice.

For the foregoing reasons, it is respectfully **RECOMMENDED**:

1.      That Plaintiff's federal claims be **DISMISSED with prejudice** for failure to state a claim on which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

2.      That Plaintiff's state law claims be **DISMISSED without prejudice**.

3.      That the clerk be directed to enter judgment accordingly and close the file.

At Pensacola, Florida this 3rd day of August 2015.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**